RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0021P (6th Cir.)
File Name: 01a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LONNIE BROCK, et al.,
   *Plaintiffs-Appellees/*
   *Cross-Appellants,*

  *v.*

CITY OF CINCINNATI; JOHN
SHIREY, City Manager,
   *Defendants-Appellants/*
   *Cross-Appellees.*

Nos. 99-3121/3584

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-00134—Herman J. Weber, District Judge.

Argued: September 19, 2000

Decided and Filed: January 19, 2001

Before: BOGGS, SUHRHEINRICH, and GIBSON, Circuit
Judges.*

_____

 *The Honorable John R. Gibson, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Roshani Hardin, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, for Appellants. Stephen S. Lazarus, HARDIN LEFTON LAZARUS & MARKS, Cincinnati, Ohio, for Appellees. **ON BRIEF:** John Williams, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, for Appellants. Stephen S. Lazarus, HARDIN LEFTON LAZARUS & MARKS, Cincinnati, Ohio, for Appellees.

_____

**OPINION**

_____

BOGGS, Circuit Judge. This case involves a claim by twelve canine-handling Cincinnati policemen for back pay and damages stemming from the City's alleged failure to pay the officers adequate compensation at the overtime rate for canine-care work performed at home while off duty, in violation of the Fair Labor Standards Act (FLSA). The district court determined what would have been, in its estimation, a reasonable time for the officers to spend caring for their canines, then concluded that the parties' agreement to pay the officers straight-time compensation for approximately 17 minutes per day, seven days a week, was unreasonable. We conclude that the district court did not properly analyze how much of the officer's efforts amounted to FLSA "work" and did not consider all of the facts and circumstances of the parties' relationship in evaluating the fairness of the agreement. Because we conclude as a matter of law that the parties reached a reasonable agreement, and that the FLSA permits reasonable agreements fixing the amount of compensation in situations like this one, we reverse the district court's judgment as to nine of the ten prevailing plaintiffs and remand for further proceedings on the tenth prevailing plaintiff's claim.

matter of law.  Therefore, we remand for further proceedings on Officer Mercado's claim in accordance with the principles elucidated in this opinion.  Because the analysis set forth herein clarifies the law on much of Officer Mercado's claim but expresses no opinion on whether he and the City reached an agreement, we also remand the issues of liquidated damages and willfulness should the district court desire to reconsider them. *See Featsent*, 70 F.3d at 907.

We REVERSE the district court's judgment for nine of the ten prevailing plaintiffs and direct entry of judgment in favor of the City of Cincinnati against all plaintiff members of the Police Division's Canine Unit.  We AFFIRM the judgment with respect to Officers Fromhold and Makin.  We VACATE the judgment in favor of Officer Mercado because it apparently relies in part on the district court's erroneous "unreasonable agreement" holding and REMAND for further proceedings on his claim.  We likewise VACATE the district court's award of attorney's fees and REMAND for reconsideration should Officer Mercado ultimately prevail.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs are twelve members of the Cincinnati Police Division who handle canines.  Eleven work in the Canine Unit; the twelfth, Officer John Mercado, is assigned to a regional drug-control unit.   Established in 1981, the Cincinnati Canine Unit has always been a volunteer assignment, with applicants selected on the basis of their performance record and an at-home interview, which typically includes the entire family and neighbors.  Candidates for canine-handler assignments undergo extensive training.  They are responsible for the care and maintenance of the dog while off duty, although the Police Division encourages officers to perform many of their canine-care tasks during the eight-hour workday. Canine handlers' responsibilities include caring for, feeding, cleaning, grooming, exercising, training, and transporting their dogs on both regular work days and days off.

The officers testified that they devoted at least one hour per day, and sometimes much more than that, to dog-care activities while off-duty.  The City has not issued a policy concerning how much time officers should spend training their dogs each day, nor has it imposed limits on how much time particular dog-maintenance tasks should take. Instead, the Police Division specifically recommended only two things: 1) that the dogs spend at least a couple of hours each day in an outdoor kennel at the handler's home, and 2) that any given activity not exceed five to ten minutes, the dogs' attention span.

Apart from these suggested limitations, canine handlers and their families enjoy a highly trained family pet largely at City expense.  For years before the Supreme Court held the FLSA applicable to state and local governments, *see generally Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528 (1985), Cincinnati provided Canine Unit members a variety of benefits not given to other officers.  Two ordinary working days per 28-day cycle are devoted to training, and officers get

one eight-hour "dog day" per 28-day period, which is a day's worth of compensatory time to cover the off-duty, otherwise uncompensated, time spent caring for the dog. A canine officer has no out-of-pocket expenses associated with the dog: the Police Division pays for food and veterinary care and builds a professional-style kennel at the officer's home so that the dog can spend time in the weather developing a suitable coat. Officers are assigned a take-home, specialized police cruiser that they can use for any police-related activity.[1] Finally, the officers regularly travel to police dog competitions, sometimes at City expense and often while on duty, to show their dogs and meet with handlers from around the country.

As early as 1985, the handlers discussed the possible application of the FLSA to their compensation package. In late 1987 or early 1988, the City's training officer, then-Sergeant now-Captain Michael Cotton, brought up the subject of the Canine Unit members' compensation with then-Lieutenant Colonel Ed Ammann, who stated that the City paid Unit members enough and advised that demands for more pay could cause the City to evaluate the economic feasibility of maintaining the Unit. Cotton also spoke informally to other supervisors, mentioning that other departments pay their canine officers more than Cincinnati, but the supervisors pointed out that some departments paid handlers less. Cotton apparently dropped the matter for some time.

Effective 1995, the compensation that Canine Unit members received for the care and maintenance of their dogs

---

[1] Cincinnati points out that having their own police cruiser means the officers have no cost associated with commuting to work, no wear and tear on their personal vehicles, and decreased insurance rates. However, some handlers were not sanguine about keeping a marked police cruiser in front of their home. Additionally, the dog's frequent presence in the cruiser means that officers generally take extraordinary measures to keep the vehicle clean.

a 28-day work period, nothing in the record indicates that the City adopted a work period that would take it outside of the rule of § 207(k), which covers any work period of between 7 and 28 days, inclusive. Under the regulations, the maximum number of hours an employer can compensate law enforcement employees for at straight time is 43 hours per week if the employer adopted a work period of either seven or fourteen days, or 42.75 hours if the employer adopted a 28-day work period. *See* 29 C.F.R. § 553.230. With respect to the Canine Unit members, the question whether the City adopted a seven, fourteen, or twenty-eight day work period— no one has suggested that the City adopted a period other than these— is meaningless because the officers and the City agreed that they would receive 42 hours of straight-time pay per week and, under whichever work period is appropriate, the regulations implementing the FLSA permit paying straight time for 42 hours and more. Because the parties' reasonable agreement does not violate the officers' rights by paying straight-time compensation when the FLSA requires overtime, the court must enforce the agreement as written. The Canine Unit members are thus entitled to no compensation other than that provided in the agreement.

## V. FURTHER PROCEEDINGS

The officers appealed the district court's determination that the City did not willfully violate their FLSA rights, and the City appealed the district court's determination that liquidated damages were appropriate. Because we hold that the City did not violate the FLSA with respect to the Canine Unit members, we need not address these arguments.

The record has not, however, permitted this court to resolve Officer Mercado's claim. The district court did not make a finding on the question of whether Officer Mercado and the City reached an agreement, reasonable or otherwise, to compensate him for "work" he performed in caring for his canine while off duty, and the record contains insufficient evidence to permit this court to make such a finding as a

contention that employers must specifically mention that provision in their employment policies in order to take shelter in the rule's safe harbor.

"As used in § 207(k), the term 'work period' refers to any established and regularly recurring period of work which, under the terms of the Act and legislative history, cannot be less than seven consecutive days nor more than twenty-eight consecutive days. Except for this limitation, the work period can be of any length, and it need not coincide with the duty cycle or pay period or with a particular day of the week or hour of the day." 29 C.F.R. § 553.224(a). In permitting the City to pay straight-time compensation for up to 42.75 hours per week, the district court apparently found that the City adopted a work period of 28 days for the Canine Unit, perhaps inferring such adoption from the time-honored dog day, which at one time awarded handlers one eight-hour day of additional compensation per 28-day cycle. By the time the dog day was incorporated into the CBA, its terms had slightly changed, presumably to bring it in line with other provisions of the CBA. Generally, the agreement provided for biweekly pay and specified that employees must work eight hours per day for five consecutive days in a regular work week running from Sunday through Saturday, and that any time beyond those 40 hours shall be paid as overtime at time-and-a-half. The special Canine Unit provision memorializing the dog day provided for compensation "biweekly at a straight time rate of four (4) hours compensatory time." The contract seems to contemplate a workweek, as opposed to a pay period, of seven days. Yet all of the provisions other than that describing the 40-hour workweek focus on the biweekly pay period, and the Canine Unit's Section 32 of the CBA explicitly relies on a biweekly structure in its provision of special pay.

On appeal, the officers argue that the proof at trial "at no time suggested that the City ever adopted a work period other than that set forth in the Labor Agreement." Pl. Br. at 13. Even if the officers were correct and the record revealed clear error in the district court's finding that the City had adopted

during off-duty hours became a provision in the Collective Bargaining Agreement (CBA) between the City and the Fraternal Order of Police (FOP). During negotiations, the City proposed that the new CBA include provisions memorializing the special canine compensation (and similar arrangements for the motorcycle and field training units) because, until then, the City had no formal authorization to pay the additional amounts. The FOP did not bargain with the Police Division over the "dog day" compensation, but checked with members to ensure that the proposal covered all previously paid benefits. At this time, at least some of the plaintiffs knew that the Unit's special compensation would appear in the new contract. One even discussed the effect of the proposal with an FOP Wage Committee member on two separate occasions before the union ratified the 1995-96 contract. The FOP representative reported that the bargaining unit would not press any demands for more compensation because the issue affected only a handful of the FOP's more than 1000 officers.

The handlers did not make the City or the police administration privy to their concerns during these negotiations. Under Ohio law, represented employees cannot bargain directly with their employers. *See* Ohio Rev. Code § 4117.11(B)(3). Ohio law likewise requires public employers to deal with certified collective bargaining units and forbids them from dealing directly with employees. *See* Ohio Rev. Code §§ 4117.04(B), 4117.11(A)(5). The plaintiffs recognize that they should have raised any concerns about their compensation with their FOP representatives so that the union could address the administration on their behalf.

Cincinnati and the FOP negotiate CBAs approximately every other year. The first contract to memorialize the Canine Unit's special compensation, the 1995-96 agreement, contained 33 sections dealing with benefits for FOP members in addition to ordinary wages. Section 32 specified additional pay for Canine Unit members in the amount of four hours of

straight-time pay per 14-day period, essentially converting the "dog day" previously allowed every 28 days to the CBA's 14-day cycle. In a subsequent round of negotiations, the FOP sought an increase in only one of seven special pay categories, that for the Motorcycle Unit. The district court found that, "[a]t no time during the negotiations for the '97-'98 labor agreement was the issue of canine compensation raised."

A few weeks after the '97-'98 negotiations ended, the officers filed a complaint seeking damages for violations of the FLSA. The district court denied cross-motions for summary judgment. Following a bench trial, the trial judge issued findings of fact and conclusions of law from the bench and later filed an order of judgment in favor of ten plaintiffs, awarding compensatory damages for the two years preceding the lawsuit and a matching amount of liquidated damages. Two Canine Unit members did not prevail, and all plaintiffs appealed.[2]

Cincinnati's motion for summary judgment argued that the parties had reached a reasonable agreement as to work performed at home, which 29 C.F.R. § 785.23 recognizes as binding. The district court considered the question of whether the agreement was "reasonable" as intensely factual, because the regulation specifies that a "reasonable agreement" must "take[] into consideration all of the pertinent facts." The court noted that the plaintiffs' opposing memorandum argued that the amount actually paid under the agreement (2 hours per week) "bears no rational relationship to the amount of

---

[2]Officers Stephen Fromhold and Steve Makin completed their canine-handling work before the two-year statute of limitations period began. They appealed because a holding by this Court that the City willfully violated the FLSA would mean that all claims are subject to the three-year limitations period applicable in willfulness cases. Because we hold that a reasonable agreement governed Canine Unit members' compensation and these officers obtained the benefit of that bargain, we affirm the district court's judgment in favor of the City against Officers Fromhold and Makin.

employers must plead and carry the burden of proving apply to particular employees. *See Corning Glass Works*, 417 U.S. at 196-97. This court has previously held that a district court has discretion to consider an argument concerning the applicability of § 207(k) even if the argument was not presented in a timely fashion, *see Featsent v. City of Youngstown*, 70 F.3d 900, 906 (6th Cir. 1995), implicitly holding that a defendant need not raise § 207(k) in its pleadings. The officers have not claimed, and we decline to hold, that the district court abused its discretion in entertaining the City's argument, however unorthodox its initial presentation to the court was.

The officers cite two cases in which courts seemed to set high burdens for employers seeking to bring themselves within the rule of § 207(k). *See Birdwell v. City of Gadsden*, 970 F.2d 802 (11th Cir. 1992); *Jerzak v. City of South Bend*, 960 F. Supp. 840, 846 (N.D. Ind. 1998). Both of those cases invoked language from *Corning Glass Works* in analyzing whether the employer had introduced sufficient proof to bring it within the rule, and neither suggests that the longer workweek provided by § 207(k) amounts to an affirmative defense that must be plead. Like those courts, we conclude that district courts should take guidance from *Corning Glass Works* in setting the burden of proof high when resolving whether the employer adopted a work period permitted by the rule (a period of 7 to 28 days) and whether certain plaintiffs are law enforcement officers within the meaning of the rule. *See, e.g.*, *Kermit C. Sanders Lodge No. 13, Fraternal Order of Police v. City of Smyrna*, 862 F. Supp. 351, 355 (N.D. Ga. 1994) (citing *Birdwell* for the proposition that "the employer must prove the applicability of the exception by 'clear and affirmative evidence.'"). Although *Birdwell* stated that "the burden is on the employer to prove he has adopted a [§ 207(k)] work-week exemption," *Birdwell*, 970 F.2d at 805 (citing *Corning Glass Works*), we take the opportunity to clarify the point by holding, more precisely, that the employer bears the burden of proving it adopted a work period that brings it within the rule of § 207(k), and reject the officers'

extending the permissible workweek for which law enforcement agencies can compensate their officers at the straight-time rate. In any event, "exemption" is hardly a talismanic term that can force a court's hand and prevent it from applying the law as set forth by Congress.

Section 207(k) does not— as the § 213 exemptions discussed in *Corning Glass Works* and all of the cases cited therein do— totally remove certain categories of employees from the record-keeping and overtime provisions of the FLSA. *See, e.g.*, 29 U.S.C. § 213(a)(1) (exempting employees employed in a bona fide executive, administrative, or professional capacity), 213(a)(3) (exempting certain employees employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center), 213(a)(5) (exempting any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life). Instead, § 207(k) contains a declaratory statement that adjusts the permissible length of the workweek but does not completely remove specified employees from the FLSA's protection: "No public agency shall be deemed to have violated subsection (a) of this section with respect to employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if . . . in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed [171 hours] compensation at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(k)(1); 29 C.F.R. §§ 553.201(a), 553.230.

The provisions of § 207(k) stand as Congress's statement of the maximum workweek for law enforcement officers. The provision's applicability to a given case is a matter of law dictated by § 207(a) itself, *see* 29 U.S.C. § 207(a) (stating, "[e]xcept as otherwise provided in this section. . . ."), rather than an "exemption" in the nature of those in § 213(a), which

time Plaintiffs actually spend caring for their canine partners." Further, "[s]ignificant questions remained as to . . . whether all the time [Plaintiffs] claim to have expended on canine care was reasonably necessary to promote Defendants' interests."

After the bench trial, the court issued findings of fact and conclusions of law. In reviewing FLSA caselaw, the district court appeared to reach the following conclusion:

> What qualifies as compensable work under the FLSA is determined by whether the employee's activity is controlled or required by the employer, is necessarily and primarily for the benefit of the employer, and is an integral and indispensable part of the job. A reasonableness standard is inappropriate in deciding how many overtime hours for which a canine officer should be compensated. [Thus,] the Court has to be direct and determine what the employer required and whether the activity was necessary and primarily for the benefit of the employer and [an] indispensable part of the job . . . .

Transcript of Findings & Conclusions ("F&C") at 371 (quoting *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 528 (2d Cir. 1998)). The court proceeded with resolving the parties' claims:

> The issue basically boils down to whether the unilateral decision of the City to pay from the beginning the two hours per week or eight hours per 28[-day] period was a reasonable analysis. I've pointed out that the City had absolute in my opinion authority to limit the amount of time and the amount of work they wanted their canine officers to spend or work with these dogs. The City did not exercise that right. . . . It is uncontroverted that the efforts [the officers] put forth to and for and on behalf of the dogs is necessary and is an appropriate part of their work and is compensable. This brings us to the crux of the case. What is a reasonable— I guess maybe to put it this way: What did these officers do as a result of their

work with these dogs and what did these officers do because of their love for the dogs and their concern and care of the dogs for their own benefit.

F&C at 377-79.

The court then determined that any information transmitted to the City about the time expended by the handlers would have come through Captain Cotton, who for many years commanded the Canine Unit, screened applicants, and trained its members, both human and canine. "Captain Cotton has testified and the [district] Court accept[ed] that one hour a day in addition to the— one hour a day as overtime on work days and one-and-a-half hour per day on non-work days. The Court adopt[ed] this evidence as the fair and reasonable and proper and permitted time of work as overtime to which these officers were entitled. The Court [found] that the agreement that appears in the collective bargaining contract is not reasonable." F&C at 380. The court found that "the amounts testified to over and above that which [it] found that the City should have reasonably known about, the hour and hour-and-a-half, were done primarily for the personal care of the dogs on behalf of the individuals and not because of the requirements of the employer, that they were done to accommodate the love and affection that the officers obviously have for their dogs. . . . Therefore, the majority of the time that the officers spend caring for these dogs is out of their love and affection for the pets, for the dogs, and not as a requirement for their— by their employer." F&C at 382-83.

The district court declined to find the City's failure to pay FLSA overtime willful but did deem liquidated damages appropriate. When the parties calculated the amount of damages, the court instructed that the exception for law enforcement officers contained in 29 U.S.C. § 207(k) applied to this case. The court's holding that, while they were at home and off-duty, the officers worked one hour of compensable time on workdays and one-and-a-half hours on non-work days meant that they deserved compensation for

time over a slightly longer week than ordinary employers can use. Section 207(k) authorizes the Department of Labor to promulgate regulations specifying the maximum allowable amount of straight time. Under those provisions, police agencies must pay overtime only when employees work "tours of duty which in the aggregate exceed" 171 hours in a 28-day work period or 86 hours in a 14-day period, which break down to maximum workweeks of 42.75 and 43 hours, respectively. 29 U.S.C. § 207(k)(1); 29 C.F.R. §§ 553.201(a), 553.230 The district court directed that the judgment consider as straight time the two hours per week paid under the dog day provision, which the officers have always collected at the straight-time rate. The first .75 hours of the previously unpaid six hours per week that the district court ordered the City pay the officers would also be straight time compensation. The City owed the officers pay at the overtime rate for only the remaining 5.25 hours per week.

The plaintiffs argue that the district court improperly considered the applicability of the § 207(k) exception because the City did not raise it as a defense in its pleadings, as required by Fed. R. Civ. P. 12(a), thereby waiving the issue. Cincinnati counters that the officers did not present this argument to the trial court, so they have themselves waived the right to raise it now. To be sure, no one had any idea that § 207(k) had any bearing on this case until midway through trial when a defense witness made reference to it. The City did not refer to the § 207(k) exception in its answer, its motion for summary judgment, or its proposed findings of fact.

The Supreme Court stated, "[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974) (citing Supreme Court cases). The City's witness and the officers' brief described § 207(k) as creating an exemption for law enforcement agencies. To be precise, § 207(k) creates at best a partial "exemption" by slightly

## IV. THE APPLICABILITY OF § 207(k)

Independent of the off-duty dog-care issue, the officers claim that the City violated the FLSA by paying them straight time for the dog day's two hours per week in excess of a 40-hour workweek. In their cross-appeal, the officers argue that the district court erred in holding that 29 U.S.C. § 207(k) permits the City to pay police officers up to 42.75 hours per week at the straight-time rate.

As the Supreme Court observed, "[a]ny custom or contract falling short of [compensation for all work or employment engaged in by employees], like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights." *Muscoda*, 321 U.S. at 597. Accordingly, if the parties' agreement here violated the officers' established FLSA rights, the courts cannot enforce it regardless of its reasonableness. As described above, the parties agreed that the officers would be paid straight time for two hours per week beyond their standard 40 hours of "on duty" time. In terms of the analysis above, the parties agreed on how much "work" the officers performed, which includes the difficult component questions of whether their exertions were required or suffered by Cincinnati, necessarily and primarily for the City's benefit, and an integral part of their employment as canine handlers. As the Seventh Circuit held, "[E]mployers and employees may resolve whether certain activity is 'work' through a collective bargaining agreement, as long as the agreement comports with the FLSA." *Leahy*, 96 F.3d at 232. Thus, if paying the officers at the straight-time rate for those two hours per week violated the FLSA, the officers can recover overtime for that "work."

In directing the parties to calculate damages, the district court instructed that the first 2.75 hours per week beyond the standard 40-hour week should be deemed straight time because 29 U.S.C. § 207(k) contains an exception from § 207(a) that permits law enforcement agencies to pay straight

eight hours per week beyond the standard 40-hour week of ordinary on-duty time. Since the City had already paid the Canine Unit officers two hours per week under the "dog day" provision, Cincinnati owed them compensation for six hours per week. Because the § 207(k) exception (allowing up to 171 hours in every 28-day pay period) applied, the FLSA permitted the City to pay the officers at their straight-time rate for up to 42.75 hours per week. To compensate them for the full 48 hours worked each week, the City owed the officers .75 hours of straight-time pay and 5.25 hours at time-and-a-half. Multiplied out, this resulted in a deficit of 8.625 hours per week at the straight-time rate.

Because Officer Mercado was assigned to the Regional Narcotics Unit instead of the Canine Unit, he did not have all of the perks of Canine Unit membership enjoyed by the other plaintiffs. His Unit did not permit him to participate in the two on-duty training days, during which Canine Unit members went through training drills and dog and vehicle maintenance. Instead, Mercado trained his canine on his own time. To account for this difference, the district court determined that Mercado should have an additional four hours per week at the overtime rate, representing a weekly share of the Canine Unit's on-duty training days.

After the parties calculated the appropriate cash figures, the court issued judgment accordingly. The City timely appealed, arguing that: 1) the trial court should have granted its summary judgment motion based on the reasonable agreement setting canine-care compensation, 2) the trial court should not have awarded liquidated damages, and 3) equity required that the plaintiffs receive no compensation. Plaintiffs cross-appealed, arguing that the trial court 1) should have found Cincinnati's FLSA violations willful, and 2) should not have allowed the City to dispense "dog day" compensation at the straight-time rate under the 29 U.S.C. § 207(k) exception allowing a longer workweek for law enforcement officers.

## II. STANDARD OF REVIEW

Cincinnati appealed from the district court's judgment that it violated the FLSA "by not providing proper compensation to members of its canine unit for maintenance and care of the dog while off duty." However, the heading of the appellant's brief seems to assign error in the trial court's "denying its motion for summary judgment on the basis that the plaintiffs were not bound by a reasonable agreement pursuant to 29 C.F.R. § 785.23." Def. Br. at 9. Cincinnati cites the summary judgment standard of review but asserts, "In this matter, the City was entitled to judgment as a matter of law." The brief proceeds to cite testimony at trial and argue the entire case, rather than press for reversal of the pre-trial order denying summary judgment. The heading notwithstanding, the gravamen of the appellant's argument assigns error in the final judgment on the merits, and we treat this appeal as presenting that question. *See Redman v. Baltimore & Carolina Line, Inc.*, 70 F.2d 635, 636 (2d Cir. 1934) (construing an assignment of error in the district court's denial of motions to dismiss the complaint for insufficient proof as presenting the question whether sufficient evidence supported the ultimate judgment); *see also Edwards v. Elliott*, 88 U.S. 532, 500 (1874) (remarking that an assignment of error is subject to a reasonable construction).

The circuit courts do not agree on the proper standard of review in a FLSA case like this one. In a case factually similar to this appeal, the Second Circuit did not articulate which standard it used. *See Reich v. New York City Transit Auth.*, 45 F.3d 646 (2d Cir. 1995). In an on-call waiting time case, the Fifth Circuit held that it reviewed findings of fact and inferences drawn therefrom for clear error, reviewing conclusions of law de novo. *See Brock v. El Paso Natural Gas*, 826 F.2d 369, 371-72 (5th Cir. 1987). In another canine-handler case involving a purported agreement as to at-home work, the Eighth Circuit ruled on an appeal from a jury verdict for the handlers and held that the employer was entitled to judgment as a matter of law because no reasonable

### D. Officer Mercado

Officer Mercado was not a member of the Canine Unit. Instead he was assigned to the Regional Narcotics Unit, a collaborative effort of the Cincinnati Police Division and other area authorities. Despite handling a canine and receiving some of the perks Canine Unit members received, he did not collect the dog day compensation and his Unit did not permit him to take advantage of the full day of on-duty training per 14-day cycle. His testimony at trial indicated that Mercado sought the special pay directly from his superiors, who simply refused his request. Mercado was a party to the Collective Bargaining Agreement, the special pay provision of which specified that "Members [of the Canine Unit] must be designated in advance by the Police Chief or his/her designee," but the record does not reveal whether Mercado sought such designation. As it stands, the record does not contain sufficient evidence for this court to determine whether Officer Mercado and the City ever reached an agreement to compensate him for the FLSA "work" he performed while off-duty. Since the record does not reveal whether Mercado actually reached such an agreement with the City, much less enumerate its terms, this court cannot presently evaluate its reasonableness, and further proceedings on remand are necessary.

### E. Summary

After finding that the City required some at-home work but set no limits on that work, the district court should have made findings as to how much time the officers spent caring for their dogs, whether that time was necessarily and primarily for the benefit of Cincinnati and whether those efforts were an indispensable part of their job as canine handlers. If it found that compensable work was involved, it should then have determined whether the "work" was *de minimis* in nature, and whether the City and the officers had reached a reasonable agreement to compensate the officers for the amount of compensable time the City suffered the officers to work.

officers' behalf. They have failed to introduce evidence to satisfy their burden of showing that "the agreement provided an unreasonably short amount of time to perform the assigned tasks" that constitute FLSA work *and* an unreasonably small amount of non-monetary benefits to compensate them for any time deficiency. The officers' conclusory statement that eleven minutes per day at the overtime rate (seventeen minutes at the straight-time rate) bears no rational relationship to the actual amount of time spent does not— even if accurate— end the inquiry, much less resolve it in their favor.

The plaintiffs argue that no reasonable agreement as to all the pertinent facts existed here because the parties did not discuss the FLSA when they decided to include the "dog day" provision in the CBA, no one knew the basis for providing the dog day, and the officers did not knowingly agree to forego their FLSA rights. While the record does not indicate whether the parties' representatives actually mentioned the FLSA when they agreed to include Section 32 in the CBA, the district court found the CBA "replete with provisions which recognize the fact that the City and the FOP were cognizant of the Act and that they provided for time-and-a-half." The parties did not need to use the specific term "FLSA" in the CBA. As long as the collective bargaining process produced an agreement in fact and the parties were cognizant that the agreement had to deal with the employees' FLSA rights, this court can proceed to the question of whether the parties reached a reasonable agreement that addressed their FLSA rights. That no one at the time knew why they selected a particular term to formalize a longstanding practice or why the practice itself existed— despite the facially obvious intent to compensate officers in a situation of an unusual workload and working conditions— does not, without more, render the agreement unreasonable. Finally, that the officers did not knowingly agree to forego their FLSA rights— the precise extent of which even this appeal has not resolved— will not permit them to avoid a collective bargaining agreement properly reached by their authorized representatives and properly adopted by their union under Ohio law.

jury could find that the agreement the parties reached was unreasonable. *See Rudolph v. Metropolitan Airports Comm'n*, 103 F.3d 677, 683-84 (8th Cir. 1996). In a more recent canine-handler case, the Second Circuit considered the standard of review appropriate to this kind of FLSA case. *See Holzapfel*, 145 F.3d at 521 (describing the circuits' different approaches). The *Holzapfel* court considered the issue a mixed question of law and fact and instructed district courts on the proper charge for juries. It stated that the

> trial judge was responsible for determining as a matter of law whether plaintiff's activities could potentially constitute "work." The jury was to decide as a question of fact, not only how much of plaintiff's time spent with Bandit [the officer's canine] fell within the court's definition of "work" and would be compensable, but also how much of that time was spent with the employer's actual or constructive knowledge.

*Id.* at 521-22.

In a case concerning an employee's possibly being covered by the FLSA's protections, this court struck a similar balance: "We review the district court's findings of fact regarding whether the employees at issue were salaried employees under the FLSA by applying the clearly erroneous standard. We review de novo the district court's ultimate determination of whether the employees at issue were salaried employees and thus exempt from the FLSA's overtime compensation provisions." *Martin v. W.E. Monks & Co.*, 1 F.3d 1241 (table), 1193 WL 300332 at *2, No. 92-3739 (6th Cir. Aug. 3, 1993).

The Fifth Circuit has enunciated a similar rule, noting that it comports with Fed. R. Civ. P. 52 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous."). As the Fifth Circuit observed, "[T]he Supreme Court specifically considered a claim for exemptions from the FLSA in *Icicle Seafoods, Inc.*

*v. Worthington*, 475 U.S. 709 (1986), and stated that 'the *facts* necessary to a proper determination of the *legal question* whether an exemption to the FLSA applies in a particular case should be reviewed by the court of appeals pursuant to Rule 52(a), like the facts in other civil bench-tried litigation in federal courts.' *Worthington*, 106 S.Ct. at 1529." *Brock*, 826 F.2d at 371-72 (emphasis added). Accordingly, we will review the district court's underlying findings of fact for clear error but review de novo the district court's application to those facts of the legal standards contained in statutes, regulations, and caselaw.

## III. THE OVERTIME CLAIM AND THE PARTIES' AGREEMENT

We analyze the plaintiffs' claims in three stages: 1) How much of the time spent by handlers in caring for their canine charges while off-duty is compensable "work" under the FLSA? 2) Is that amount of time *de minimis*, so that the FLSA does not mandate compensation? 3) Have the parties reached a reasonable agreement to compensate the handlers for non-*de minimis* time spent in "work" under the FLSA?

### A. "Work"

Plaintiffs claim that the City under-compensated them in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. Section 207(a)(1) declares, "Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half-times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).[3] The Supreme Court interpreted the FLSA in the seminal case of *Tennessee Coal, Iron & Railroad*

---

[3] As discussed below, the exception contained in § 207(k) applies to this case and extends the permissible straight-time workweek for the Plaintiffs to either 42.75 or 43 hours per week.

expenditures of time.[7] The court held, "It is not enough for plaintiffs to show that they worked more than agreed. They must show that the agreement provided an unreasonably short amount of time to perform the assigned tasks" that constitute FLSA work. *Ibid.* The plaintiffs there failed to do so because they presented "no evidence that a reasonable employer would necessarily have known that half an hour per . . . day was too short a time to perform the tasks [the employer] told the officers to perform." *Ibid.*

Our review of the facts and circumstances revealed in the record leaves us convinced that the parties reached a reasonable agreement. Nothing disclosed in the record indicates that Cincinnati must have known that 17 minutes per day of compensatory time far under-approximated the actual amount of FLSA "work" performed by the plaintiffs. Moreover, nothing indicates that the non-monetary support that the City provided to plaintiffs in the form of a take-home cruiser, taxpayer-provided dog food, veterinary care, a kennel, travel to competitions, and on-duty training days failed to compensate them reasonably for any deficiency the seventeen minutes of straight-time pay embodied in the CBA's dog day may have left. The actual amount of time spent in FLSA "work," if reliably ascertained, is a reference point for a range of reasonable agreements, a range that is widened by a variety of non-monetary costs and benefits. The City's package was comprehensive; that it included a relatively small amount of paid time does not, by itself, render the agreement unreasonable.

These officers entered the all-volunteer Canine Unit with eyes wide open, and the City twice negotiated with their exclusive bargaining representative, who first neglected and then outright refused to press the compensation issue on the

---

[7] The agreement provided for 30 minutes of work on all days, a take-home vehicle, and no specialist compensation. It also specified that handlers had to obtain prior approval for any additional time they thought necessary.

the officers caring for their dogs at home represented their (reciprocated) personal devotion, love, and affection for their canine partners. The district court's failure to consider the myriad nuanced circumstances other than dog-care time that comprise "all the pertinent facts" in this case warrants our deeper analysis.

Two other circuits have considered this issue of whether canine handlers and their employers had reached a reasonable agreement. In *Holzapfel*, the court refused to characterize the employer's policy[6] as "reasonable" because the employer seemed to have imposed its policy on the handlers, no evidence suggested that any canine officer was involved in determining how much overtime was sufficient, and the police chief testified that up to one hour per day, exclusive of training, could be expended on dog-care activities. *See Holzapfel*, 145 F.3d at 526-27. In *Rudolph*, the jury found a reasonable agreement as to on-duty days, and the appeals court held the employer entitled to judgment as a matter of law because the agreement was reasonable as to off-duty days as well. *See Rudolph*, 103 F.3d at 684.

While the *Rudolph* plaintiffs insisted that the employer knew or had reason to know that they performed work for the employer's benefit beyond that provided for in the agreement, the court deemed the employer entitled to rely on the plaintiffs to follow the clear terms of their agreement and held that the employer neither suffered nor permitted additional

---

[6]The policy included two days per month of scheduled retraining and two hours per week of overtime compensation. The case does not indicate whether the department assigned the officers a take-home police cruiser, built a kennel at the handlers' homes, or paid for all food and veterinary care. Officer Holzapfel contended that "he spent between 44-45 off-duty hours each week grooming, bathing, feeding, exercising, training, and cleaning up after Bandit." *Holzapfel*, 145 F.3d at 520.

*Co. v. Muscoda Local No. 123*, and regarded these provisions "as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employment." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944). The term of art "work," which includes "to suffer or permit to work," 29 U.S.C. § 203(g), means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Muscoda*, 321 U.S. at 598. Even work performed off-duty can qualify as work and entitle an employee to compensation under the FLSA. *See Steiner v. Mitchell*, 350 U.S. 247, 256 (1944) (holding that employees must be compensated for "activities performed either before or after the regular work shift . . . if those activities are an integral and indispensable part of the principal activities for which covered [employees] are employed").

Foreshadowing the *de minimis* doctrine and the problems associated with unsupervised at-home duties that may not be exclusively for the employer's benefit, the Supreme Court long ago noted, the FLSA "does not foreclose, of course, reasonable provisions of contract or custom governing the computation of work hours where precisely accurate computation is difficult or impossible. Nor are we concerned here with the effect that custom and contract may have in borderline cases where the other facts give rise to serious doubts as to whether certain activity or non-activity constitutes work or employment." *Muscoda*, 321 U.S. at 597; *cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 136-37 (1944). "This means that employers and employees may resolve whether certain activity is 'work' through a collective bargaining agreement, as long as the agreement comports with the FLSA." *Leahy v. City of Chicago*, 96 F.3d 228, 232 (7th Cir. 1996).

Therefore, to determine whether the officers performed compensable "work," the district court had to confront three

issues: 1) Did Cincinnati require or suffer the handlers to perform the dog-care duties at issue? 2) How much, if any, of their off-duty exertion did the handlers pursue necessarily and primarily for the benefit of the City? 3) Was this off-duty effort an integral and indispensable part of the principal activities for which the handlers were employed?  *See Holzapfel*, 145 F.3d at 523.

### 1. Exertions Required or Suffered by Cincinnati

The district court found that Cincinnati required the handlers to take their dogs home and care for them there.  It observed that the City had plenary authority to limit the amount of time officers spent working with their dogs but chose not to exercise that right beyond recommending that dogs spend at least two hours per day in their outdoor kennels.  Considering the § 203(g) definition of "work," the court stated: "The other part of the equation is did the employer know that this work was being performed? Did the employer know the extent of the work . . . ? And did the employer suffer or permit the work to be performed?"  F&C at 379.  The court observed that the officers could have brought their concerns to the attention of their FOP representatives for discussion at collective bargaining, but the officers declined to do so.  The court then mentioned Captain Cotton's testimony, finding that the City knew, through Cotton's knowledge, that the officers were spending a significant amount of time caring for their dogs off-duty: "Captain Cotton has testified and the Court accepts that one hour a day in addition to the— one hour a day as overtime on work days and one-and-a-half hour per day on non-work days.  The Court adopts this evidence as the fair and reasonable and proper and permitted time of work as overtime to which these officers are entitled."  F&C at 380.  At this point, without further analysis, the district court held "that the agreement that appears in the collective bargaining contract is not reasonable."  *Ibid*.

The key question is whether the agreement the parties reached is reasonable, meaning one out of a variety of acceptable agreements.  A court's task is not to find *the* reasonable agreement, for none exists.  Instead, a court must ascertain whether *this* agreement falls within a broad zone of reasonableness, considering its terms and all of the facts and circumstances of the parties' relationship.

The district court did not examine all of the pertinent facts in the agreement, as § 785.23 explicitly and *Muscoda* implicitly instruct.  In issuing its abrupt "unreasonable agreement" holding, the district court nowhere mentioned that the City provided each officer with a take-home police vehicle (with all the benefits and detriments that brings) or that the City built an elaborate concrete-base fenced dog kennel at the handler's home.  In reaching its determination as to the reasonableness of the agreement, the district court did not mention that the City pays for all dog food and veterinary care.  Additionally, the City occasionally paid to send the officers to police dog competitions, treated participation in such competitions as "on duty" time, and allowed the officers one full day per 14-day cycle for "on duty" training and dog and vehicle maintenance. The district court did not consider— perhaps because these factors defy calculation— the costs and benefits of having a highly trained police dog (and family pet) in the officer's home and of having a familiar companion at the officer's side while patrolling the streets of Cincinnati. Nor did the district court consider the administrative costs and other problems the City would face in attempting to monitor or measure how much "work" the officers performed at home while off duty. The court stressed that the City did not issue any limitations on the amount of time officers spent caring for their dogs off-duty, but the record clearly established that the City recommended sending the dogs outside for least two hours per day and encouraged the officers to treat the dogs as family pets while at home.  The district court's most significant comments on the complexities of the work/non-work problem in this case acknowledged that an appreciable portion of the time spent by

of agreements between the parties. *See Holzapfel*, 145 F.3d at 527.[5]

This court reviews de novo the ultimate question of whether the parties reached a reasonable agreement to compensate the officers for their time. *Cf. Martin v. W.E. Monks & Co.*, 1 F.3d 1241 (table), 1193 WL 300332 at *2, No. 92-3739 (6th Cir. Aug. 3, 1993). As described above, we are borrowing from the district court's hour-on-workdays-and-hour-and-a-half-on-non-workdays "reasonable time" finding and presuming that that figure actually represents the amount of FLSA "work" the officers performed while off-duty. The district court's "reasonable time" finding, illuminated by its context, resembles a conclusion that an agreement fixing compensation at that figure would be a reasonable one. The next sentence's conclusory statement that the parties' agreement here was not reasonable likely results from a comparison of the "reasonable time" figure to the actual agreement, which provided only seventeen minutes of compensation per day. Such a simple comparison— even if it rested on a "work" rather than a "reasonable time" comparison—is not sufficient to resolve the question of the agreement's reasonableness.

---

[5] The court wrote:
The underlying concern about situations like those involving Officer Holzapfel is the difficulty an employer encounters in monitoring the number of off-duty hours a K-9 officer will spend with his assigned dog. Over-zealous employees could cause unintended bankruptcies within police departments, and ultimately force municipalities to eliminate K-9 units— despite their valuable contributions to law enforcement— because of cost. ... [After reaching an agreement] K-9 officers will know precisely the extent of their responsibilities. Municipalities and their police departments can budget with relative accuracy, and minimize concern that they will be required to defend against an overtime claim involving thousands of dollars.
*Holzapfel*, 145 F.3d at 527.

The court's finding, in reliance on Captain Cotton's testimony, served as the lodestar of the judgment. Assuming this finding accurately reflects Cotton's testimony[4] or has support elsewhere in the record, it is irrelevant to all of the three questions posed above. The court's finding seems to be its conclusion as to a reasonable amount of time to compensate the officers for. That the court's very next statement found the collective bargaining agreement unreasonable, with no further analysis, confirms that the district court misdirected its inquiry.

---

[4] Captain Cotton admitted that canine handlers occasionally discussed whether 17 minutes per day, the daily value of the "dog day," is sufficient to maintain the dogs off-duty. *See* T. at 285 (Cotton testimony). Cotton agreed with the handlers that 17 minutes was not sufficient compensation for the at-home care and maintenance of the canines. *See* T. at 288 (Cotton testimony). In response to a question from the bench, Cotton commented that off-duty days involved more at-home work than on-duty days, because, "[t]here's some grooming and exercising that you can do [on] duty. Therefore, if you're off duty, they would have to be done on your own time." T. at 300 (Cotton testimony). When asked if any canine handlers had ever told him what they thought the adequate amount of time should be for their compensation, Cotton replied, "I think we came to a general conclusion about an hour, an hour-and-a-half per day." T. at 279 (Cotton testimony).
The witness did not state that this figure represented the amount of time officers ordinarily spent caring for their canines; he said that he and the handlers thought that they should be paid for an hour to ninety minutes per day. So understood, this figure sounds like a bargaining demand, representing the amount of time the officers would like the City to pay them for; it does not speak to how much time the officers actually spent caring for their dogs. Even if Captain Cotton meant these statements as an indication of how much time officers ordinarily spent caring for their dogs, it does not address how much of that time was spent necessarily and primarily for the benefit of the City. At best, the district court took a series of logical leaps to find that Captain Cotton's testimony reflected a fair request by officers for payment for efforts expended primarily to benefit the City. To the extent this finding purports to determine the amount of "work" the officers performed, it amounts to clear error because it has uncertain support in the record and, as explained in the text, probably reflects consideration of an inappropriate legal standard.

The district court in *Holzapfel* went similarly astray when it instructed the jury to determine whether the plaintiff "'spent additional time, over and above the 40 hours of regular time plus 2 hours of overtime per week for which he was compensated, in performing work which was . . . *reasonably necessary to fulfill his duties* of feeding, grooming, caring for, and training the K-9 unit dog assigned to him . . . .'" *Holzapfel*, 145 F.3d at 520 (quoting the district court's jury instructions) (emphasis added). The Second Circuit determined that the "reasonable time necessary to complete a task" standard relied on by the district court in formulating the jury charge originated in a Tenth Circuit case. The analysis and holding in that case was designed to prevent employees from collecting overtime for tasks on which they could spend an inordinate amount of time because the employees had "'considerable flexibility and personal discretion with regard to the time and speed [at which] these activities took place.'" *See id*. at 526 (quoting *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994)). The Second Circuit rejected the "reasonable time" standard as a possible substitute for a direct finding on how much "work" officers performed because the "individual traits and needs of officers and animals preclude any easy determination as to what is a 'reasonable time' for a K-9 officer to take care of his dog." *Ibid*. Although the district court here recited the Second Circuit's holding that "[a] reasonableness standard is inappropriate in deciding how many overtime hours for which a K-9 officer should be compensated," *see* F&C at 371 (quoting *Holzapfel*, 145 F.3d at 516), the hour-to-hour-and-a-half finding appears to be just that: a determination of what is a reasonable amount of time. Reasonableness, the Second Circuit noted and we today hold, is appropriate only in evaluating *agreements* concerning work to be performed and the compensation therefor. *See Holzapfel*, 145 F.3d at 526-27. Courts should not inquire into the reasonableness of the amount of work employees actually performed or determine what would have been a reasonable amount of work for an employer to seek and an employee to perform.

contract or custom may govern the computation of work hours. *See Muscoda*, 321 U.S. at 597. Because of the difficulty in determining the exact hours worked in circumstances where unsupervised employees can divide their time between "work" and personal pursuits, "any reasonable agreement of the parties which takes into account all of the pertinent facts will be accepted." 29 C.F.R. § 785.23. Similarly, when "work" might itself be a personal pursuit, resolving whether particular efforts were expended necessarily and primarily for the benefit of the employer proves so unrealistic that courts should not only accept and enforce reasonable agreements, but should encourage them.

The *Rudolph* court deemed the rationale for having the "reasonable agreement as to home 'work'" rule particularly germane to canine handler cases. *See Rudolph*, 103 F.3d at 681. Noting that the "employer cannot easily determine how long the officers work at home caring for the dogs," the court observed that "[t]he indeterminate nature of these tasks . . . makes them exactly the sort of work as to which it makes sense for the parties to come to an agreement, to eliminate complicated, repetitious, and hard-to-resolve disputes about exactly how much time it took to take care of the dogs each day." *Ibid*. And the *Rudolph* court did not even mention the added complexity of sorting out how much of the time spent feeding, grooming, exercising, and playing with the dogs was expended necessarily and primarily for the benefit of the employer. With difficult factual problems swirling around both the issue of what amounts to FLSA "work" and the monitoring and calculation of time spent on such "work," we regard the § 785.23 reasonable agreement provision as doubly appropriate in canine handler cases. *Cf. Holzapfel*, 145 F.3d at 527 (viewing agreements as the best solution to the overtime problem presented by canine-handler cases and encouraging their use); *accord New York City Transit Auth.*, 45 F.3d at 647 n.1 (noting that the Department of Labor and the Transit Authority had reached an agreement to amend the CBA to compensate handlers). As the Second Circuit remarked, sound policy considerations also counsel in favor

with the dogs. *See New York City Transit Auth.*, 45 F.3d at 652. The court found that actual dog-care en route comprised occasionally restraining the dogs when they barked or misbehaved, rarely cleaning up after dogs who soiled their handlers' cars, now and then stopping to walk the dogs, and sometimes stopping in the heat of summer to give the dogs water. *See ibid.* "Considered in the aggregate, the time spent by handlers in dog-care duties during the commute was neither substantial, nor regularly occurring. . . . [F]urthermore, it would be administratively difficult to monitor and record the time expended by handlers in dog-care duties during the commute." *See id.* at 652-53. Accordingly, the court held the "work" time at issue *de minimis* and remanded for judgment in favor of the employer. *See id.* at 653.

The district court never considered the issue, but the doctrine probably does not apply here. Several officers testified that they spent upwards of an hour per day on at-home off-duty dog-care activities, and the trial court's apparent finding that an hour to an hour-and-a-half per day amounts to a reasonable amount of compensable dog-care "work" strongly indicates that the aggregate amount of time is anything but negligible and that it occurred regularly. The trial court made no findings as to administrative difficulty in monitoring the actual amount of time spent, but common sense permits this court to presume meaningful monitoring would prove difficult, expensive, and intrusive. *Accord Holzapfel*, 145 F.3d at 527; *Rudolph*, 103 F.3d at 681; *New York City Transit Auth.*, 45 F.3d at 652-53. Nevertheless, the gross amount of time spent and its regular recurrence likely outweigh the administrative difficulty factor, so we may fairly presume that the *de minimis* doctrine does not apply.

### C. Reasonableness of the Agreement

As the Supreme Court noted in *Muscoda*, if precisely accurate computation of the amount of time expended in "work" is difficult or impossible, reasonable provisions of a

At this stage of the analysis, the court must not consider any agreement the parties may have reached but instead measure, if possible, how much time the officers spent on exertions Cincinnati either required or suffered. The testimony of the officers revealed that they spent a significant amount of time caring for their dogs while off-duty, as much as two hours per day or more. The City required officers to perform some dog-care duties while off-duty, but it did not issue a directive or specific order as to how much time the officers had to spend caring for their dogs each week. The City suffered the officers to exert themselves in dog-care activities to the extent the officers saw fit to maintain healthy, well-trained police dogs. But the City also expected the officers to bond with their canines such that they would become, essentially, family pets while at home. Accordingly, the second question becomes critical to our resolution of how much "work," within the meaning of FLSA law, the officers performed.

### 2. Necessarily and Primarily for the Benefit of Cincinnati

Answering the second question with reference to its resolution of the first, the district court determined, "[T]he amounts testified to over and above that which I have found that the City should have reasonably known about, the hour and hour-and-a-half, were done primarily for the personal care of the dogs on behalf of the individuals and not because of the requirements of the employer . . . ." F&C at 382. This finding's dependence on the district court's inappropriate "reasonable time" calculation vitiates much of its value. Ordinarily, this stage of the analysis would require courts to determine what portion of time spent with the dogs— including feeding, playing, watching television, petting, and all the ordinary activities owners engage in with their pets— necessarily and *primarily* benefitted the City. Examining the minutiae of how long it takes to feed a dog or clean up after it is difficult enough, but determining whether a dog got a treat or a pet or a scratch primarily for the benefit of the City of Cincinnati borders on (and may exceed) the limits of the absurd. Thankfully, for purposes of discussion, we may

borrow from the district court's flawed "reasonable time" finding and assume that the officers exerted themselves in activities that were necessarily and primarily for the benefit of their employer for one hour on workdays and one-and-a-half-hours on non-workdays.

### 3. An Indispensable Part of Primary Activities

The district court found the handlers' efforts a "necessary and . . . an appropriate part of their work . . . ," F&C at 378, but such finding does not clearly resolve the third question, which asks whether the officers' off-duty efforts were an integral and indispensable part of the principal activities of their employment. Although the question is subject to debate, the Second Circuit has held that "walking, feeding, training, grooming, and cleaning up are integral and indispensable parts of the handler's principal activities and are compensable as work." *New York City Transit Auth.*, 45 F.3d at 651. Likewise, although the plaintiffs in *Rudolph* conceded that dog care amounted to only a small part of their total work as officers, the Eighth Circuit implicitly held that dog care meets the FLSA definition of "work." *See Rudolph*, 103 F.3d at 681-82; *see also Karr v. City of Beaumont*, 950 F. Supp. 1317, 1322-23 (E.D. Tex. 1997) (holding as a matter of law that post-shift time spent caring for dogs is a principal activity); *Andrews v. DuBois*, 888 F. Supp. 213, 217 (D. Mass. 1995) (determining that feeding, grooming, and walking are indispensable parts of maintaining dogs as law enforcement tools, that such activities are closely related to the duties of a canine officer, and that therefore, such time is spent "working").

The ample record before us permits this court to resolve the legal question of whether a canine handler's at-home off-duty dog-care efforts are a necessary and integral part of their principal activities as law enforcement officers. The uncontroverted proof shows that Cincinnati required the officers to take the canines home with them, look after them at all times, keep them well-nourished and in good health, and

have them ready for recall to active service at a moment's notice. This proof adequately answers the third question in the affirmative.

### 4. Conclusion: "Work"

This court assumes, for purpose of the foregoing discussion, that at least some of the plaintiffs' dog-care efforts amount to FLSA "work," *i.e.*, an exertion not specifically required by but expended (as expected) necessarily and primarily for the benefit of the Cincinnati Police Division, and serving as an integral and indispensable part of the police officers' duties as canine handlers.

### B. The De Minimis *Work Doctrine*

In 1946, the Supreme Court seemed to recognize the *de minimis* work doctrine, which enables courts to treat theoretically compensable work as noncompensable under the FLSA when the amount of such work is negligible. *See generally Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). "The workweek contemplated by § [207(a)] must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the regularly scheduled working hours, such trifles may be disregarded. . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Id.* at 692. The Ninth Circuit articulated three factors for consideration in assessing whether otherwise compensable time is *de minimis*: 1) the practical administrative difficulty of recording the additional time; 2) the size of the claim in the aggregate; and 3) whether "the claimants performed the work on a regular basis." *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984) (holding that an average of seven to eight minutes of pre-shift activity is *de minimis*).

In its first canine handler case, the Second Circuit applied the *de minimis* work doctrine to canine-care duties performed while officers commuted from home to work in their own cars