**Jeffrey S. ROEMER, Plaintiff,**

v.

**CITY OF DAYTON, et al., Defendants.**

No. 3:01cv436.

United States District Court,
S.D. Ohio,
Western Division.

July 6, 2007.

Mia Wortham Spells, Michael C. Thompson, Wright–Dunbar Village, Dayton, OH, for Plaintiff.

Edward Harrison Blakemore, John C. Musto, City Attorney's Office, Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH, for Defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 22); CONFERENCE CALL SET.

WALTER HERBERT RICE, District Judge.

Plaintiff is a former police officer for the City of Dayton, Ohio, in the canine (K–9) unit. He alleges that he was subject to varying degrees of harassment during his employment, including psychological intimidation, as well as theft of personal property from his home. He filed the present matter against the City of Dayton, as well as a number of members of the Dayton Police Department and the Dayton City Commission, in their individual and official capacities. Specifically, Plaintiff alleges deprivations of his Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. §§ 1983, 1985 (Count One); a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, arising out of Defendants' alleged failure to compensate him properly for the time he spent caring for his dog (Count Two); and, finally, claims under Ohio state law, including retaliation, in violation of the Ohio Whistleblowers Protection Act, Ohio Rev.Code § 4113.52 and intentional infliction of emotional distress (Count Three). Plaintiff seeks compensatory and punitive damages, as well as injunctive and declaratory relief. Jurisdiction in this Court is proper, pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

The matter is currently before the Court on Defendants' Motion for Summary Judgment (Doc. # 22). For the reasons assigned herein, Defendants' motion is sustained in part and overruled in part.

## I. Standards Governing Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted,

specifically called to its attention by the parties.

## II. Background[1]

Plaintiff began working for the Dayton Police Department in October, 1989, and was assigned to the canine unit in June, 1991. As a member of said canine unit, Plaintiff took his dog home with him at night, necessitating off-duty care and maintenance of his "canine partner." *See* Affidavit, Doc. # 24, Ex. 1 ("Roemer Affidavit"), ¶ 17. In 1993, the City of Dayton entered into a collective bargaining agreement ("CBA") with its police officers regarding compensatory time for canine officers. The CBA indicates that "[c]anine handlers will be given eight (8) hours of compensatory time each month for off duty care of their canines" (Doc. # 22, Ex. A). Said compensatory time refers to additional compensation provided to canine handlers who devote off-duty time to the care of their canines.

In 1997, Plaintiff was recruited to serve on an interim S.W.A.T. team that formed to replace the S.W.A.T. team, the members of which had "resigned en masse" to protest the assignment of a female police officer—Officer Monica Hunt ("Hunt")—to the S.W.A.T. team (Roemer Affidavit at ¶ 5). The interim team was commanded by Lieutenant Robert Chabali, and Defendant Michael Brown ("Brown") was a supervisor. Brown, along with Defendants Temple, Doe and Beecham conspired to harass and intimidate him by, *inter alia*, issuing verbal and written reprimands to him and requesting that he perform additional, unassigned duties (Id. at ¶ 8). Brown "would make physical gestures when he saw [Plaintiff], or any other member of the interim S.W.A.T. team [wherein] he would slash his finger across his own

throat in what [Plaintiff] believe[d] was an indication that he would cut [Plaintiff's] throat or that [Plaintiff] had cut [his] own throat" (*Id.* at ¶ 9). Plaintiff also perceived discrimination and harassment committed against Hunt by various members of the Police Department (Roemer Affidavit at ¶ 10). On August 10, 2001, he wrote a letter to Major Wanda Smith, Superintendent of Operations and E.E.O.C. Officer at the Dayton Police Department, describing, *inter alia*, the alleged harassment perpetrated against Hunt. Specifically, Plaintiff indicated that Hunt's picture was plastered on the range fence at the Department's training facility, with "slanderous statements" (Doc. # 24, Ex. 2 at 1 ("Smith Letter"), referred to in Roemer Affidavit at ¶ 10).

On an undisclosed date, Plaintiff entered into a residential lease with Defendant Beecham, in which Plaintiff rented an apartment located at 729 Irving Ave., Apt. A. On or about July 5, 2001, while the lease was still in effect, Defendants Temple, Brown, Beecham and Doe entered his apartment, without a search warrant, removed several of Plaintiff's personal items, and stored them in the City of Dayton's property room (Roemer Affidavit at ¶ 12, 14–15).

## III. Analysis

### A. *Constitutional Claims*

Plaintiff alleges that Defendants conspired to deprive him of equal protection of the laws, in violation of the Fourteenth Amendment, and 42 U.S.C. § 1985. Plaintiff further alleges that Defendants deprived him of his right to be free from unreasonable searches and seizures, by entering his home without a warrant or prob-

---

1. For purposes of ruling on the Defendant's Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiff, who is the non-moving party.

able cause and removing various personal effects, in violation of the Fourth Amendment and 42 U.S.C. § 1983. Each argument will be addressed in turn.

### 1. Equal Protection

■ To establish a claim under 42 U.S.C. § 1985(3),[2] a plaintiff must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 839 (6th Cir.1994), *citing Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir.1994). Furthermore, the Supreme Court has made it clear that, in order to prove a conspiracy under § 1985(3), "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), *quoting Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

■ Plaintiff's equal protection claim fails as a matter of law, because he does not allege nor demonstrate membership in any protected class. As Defendants note (Doc. # 26 at 12), if Plaintiff claims membership in a class of whistleblowers, this argument also fails as a matter of law, as whistleblowers are not a class protected by § 1985. *See Hicks v. Resolution Trust Corp.*, 970 F.2d 378 (7th Cir.1992) (listing authority). Accordingly, summary judgment is appropriate with respect to Plaintiff's equal protection claim under § 1985(3).

### 2. Fourth Amendment

■ Plaintiff alleges that the entry into his home by a number of the Defendants constituted a violation of his Fourth Amendment rights, actionable under 42 U.S.C. § 1983. The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), protects "[t]he right of the people to be secure in their persons, *houses*, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). *See also United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297,

---

**2.** Section 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any

lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").

■ Defendants correctly note that, to state a claim under § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution or the laws of the United States by a person acting under color of state law (Doc. # 26 at 8, *citing Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992)). The Supreme Court has held that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (*quoting United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). The Supreme Court has further held that "[s]tate employment is generally sufficient to render the defendant a state actor." *Id.* at 49, 108 S.Ct. 2250 (*quoting Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Thus, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *Id.* at 49–50, 108 S.Ct. 2250 (*citing Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)).

■ Herein, Plaintiff claims that Defendants, police officers for the City of Dayton, entered his home without a warrant or probable cause,[3] removed personal items, and placed some of them in the property room of the Dayton Police Department (Roemer Affidavit at ¶ 15). Viewed in a light most favorable to Plaintiff, the evidence shows a fairly serious abuse of Defendants' positions as police officers. This, therefore, allows an inference that Defendants acted under color of state law. To be sure, executing searches and seizures, *the fruits of which are deposited into the property room of a city's police department,* is undoubtedly conduct reserved to individuals who possess the authority of the state. In arguing otherwise, Defendants fixate on Plaintiff's statement in his Memorandum [Opposing] Summary Judgment that the actions of Defendants were "taken under the guise of a private landlord/tenant relationship between the plaintiff and defendant Beacham" (Doc. # 24 at 5).[4] The Court does not find that statement in Plaintiff's brief to be dispositive. Instead, the fact that the personal possessions allegedly taken from Plaintiff's home by Defendants were apparently placed in the City of Dayton property room creates a genuine issue of material fact as to whether Defendants acted under of color of state law. To that end, despite Defendants' insistence that the entry of Plaintiff's apartment was the result of a conflict between Plaintiff and Beacham that "did not arise out of Beacham's official duties" (Doc. # 26 at 11), the Court believes that a reasonable jury could, in fact, conclude

**3.** Defendants do not contend that probable cause existed for the officers to enter and search Plaintiff's home; instead, they argue simply that the officers did not act under color of state law.

**4.** Defendants also frame the analysis differently, in that they rely on the state action doctrine to conclude that the power of the state was not implicated here. As such, they describe three tests that the Supreme Court has used to discern the presence of state action. *See* Doc. # 26 at 8–10, describing the public function test, the state compulsion test and the symbiotic relationship test. However, each of these tests was designed to answer the question of whether, in a given situation, a private actor's conduct may nonetheless constitute state action. Since the Court believes that Defendants herein acted as police officers, and not as private actors, these three tests are inapposite to the present inquiry.

that the entry of the apartment and the seizure of Plaintiff's possessions occurred under color of state law. Therefore, Defendants' motion for summary judgment is overruled, with respect to Plaintiff's claim under § 1983.

## B. *FLSA*

■ Plaintiff claims that, pursuant to his assignment to the canine unit, he was forced to work a substantial number of overtime hours caring for his dog, for which he was not compensated, in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.* Section 207(a)(1) declares, "[e]xcept as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half-times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The Supreme Court interpreted the FLSA in the seminal case of *Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123,* and regarded these provisions "as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employment." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). The term of art "work," which includes "to suffer or permit to work," 29 U.S.C. § 203(g), means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Muscoda,* 321 U.S. at 598, 64 S.Ct. 698. Even work performed off-duty can qualify as work and entitle an employee to compensation under the FLSA. *See Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that employees must be compensated for "activities performed either be-

fore or after the regular work shift ... if those activities are an integral and indispensable part of the principal activities for which covered [employees] are employed").

■ As noted *supra,* the City of Dayton entered into a Collective Bargaining Agreement with its police officers in 1993. The CBA explicitly addresses extra compensation for dog handlers in the canine unit by providing for eight hours of compensatory time for such officers each month. In support of its motion for summary judgment, Defendant urges that, to the extent that the CBA embodies the agreement reached between the officers and the City, it should control as to the issue of whether the extra compensation received by Plaintiff for caring for his dog was appropriate.

The Sixth Circuit recently addressed a case highly similar to the present matter. In *Brock v. City of Cincinnati,* 236 F.3d 793 (6th Cir.2001), the court reviewed claims brought under the FLSA by police officers seeking back wages for time spent providing off-duty care for dogs in the canine unit. There, the District Court had held that the parties' agreement that the officers would be compensated an additional 17 minutes per day for care of their dogs was unreasonable. In reversing that determination, the Sixth Circuit identified three relevant inquiries to be made in addressing this type of claim under the FLSA: 1) how much time spent by handlers in caring for their canine charges while off-duty is compensable "work" under the FLSA; 2) whether that amount is *de minimis,* such that the FLSA does not mandate compensation; and 3) whether the parties have reached a reasonable agreement to compensate the handlers for non-*de minimis* time spent in "work" under the FLSA. *Id.* at 800. With regard to this latter element, the court explained that "[b]ecause of the difficulty in deter-

mining the exact hours worked in circumstances where unsupervised employees can divide their time between 'work' and personal pursuits, 'any reasonable agreement of the parties which takes into account all of the pertinent facts will be accepted.'" *Id., quoting* 29 C.F.R. § 785.23. In that regard, proof of an agreement reached is highly beneficial, because it reflects consensus among the parties as to the first two inquiries, to wit: how much off-duty time is devoted to activities that could be deemed compensable work, and whether it falls under the rubric of the FLSA. In criticizing the District Court's analysis with respect to the above inquiry, the court particularly noted the importance of looking to any agreement reached between the parties as an indicator of reasonableness: "With difficult factual problems swirling around both the issue of what amounts to FLSA 'work' and the monitoring and calculation of time spend on 'work,' we regard the § 785.23 reasonable agreement provision as doubly appropriate in canine handler cases.'" *Id.* at 805. The court went on to clarify that an agreement is not deemed unreasonable simply upon proof that a plaintiff worked more than he agreed; instead, a plaintiff must produce evidence that the agreement provided an unreasonably short amount of time to perform the assigned tasks that constitute FLSA work *and* that there was an unreasonably small amount of non-monetary benefits to compensate for any time deficiency. *Id.* at 807.

As Defendants indicate, the CBA, which has been in place since 1993, provides that officers assigned to the canine unit who have charge of a dog receive eight hours of compensatory time per month (Doc. # 22, Ex. 1). In addition to submitting a copy of Dayton Police Department General Order 2.04–2, which contains the CBA provision cited herein, Defendants submit the Affidavit of Michael A. McCune, a Sergeant with the Dayton Police Department, who swears that Plaintiff received said eight hours of compensatory time each month for off-duty care of his canine, pursuant to the CBA (McCune Affidavit, Doc. # 22, Ex. A ¶ 6). The fact of Plaintiff's compensation is confirmed by his own affidavit, in which he indicates that he received eight hours of compensatory time each month from June of 1991 to August of 2001 (Roemer Affidavit at ¶ 17). Finally, Defendants point to the absence of evidence presented by Plaintiff that the CBA provision respecting this overtime compensation is unreasonable under the circumstances (Doc. # 22 at 10).

In his response, Plaintiff erroneously conceives of the presence of such a provision in the CBA as an "exception" to the rule that employees must be paid for off-duty work (Doc. # 24 at 6–7). As explained *supra*, this is simply not the case. Instead, the presence of an agreement (e.g., a provision in a CBA such as the one at issue here) is highly useful in determining how to measure an employee's off-duty work that should be compensated pursuant to the FLSA, because it demonstrates a mutual decision on reasonableness reached by the parties. Plaintiff does not challenge the reasonableness of the agreement, although he does seem to imply that the fact of its enactment is in dispute (*Id.* at 6). Yet, he offers nothing beyond his unverified assertion (i.e., no affidavit or deposition testimony) that this is so.

Plaintiff also points out that he began serving as a canine unit officer in 1991—two years before the adoption of the CBA, and argues that he should therefore be compensated "in compliance with the FLSA, for the two years that he worked prior to the agreement" (*Id.* at 7). The defect in this argument is that it is contradicted by Plaintiff's very own affidavit, wherein he indicates that he received eight hours of compensatory time each month

from June of 1991, until August of 2001— i.e., the same amount of compensation provided by the CBA.

Plaintiff argues that "[w]hether an agreement is 'reasonable' [such as] to allow an exception to the FLSA is a fact sensitive determination that requires an inquiry and a weighing of what work is actually expended and what benefit is provided in exchange for off-duty care," and that the provision of the CBA providing eight hours of compensatory time for off-duty care of canines is too vague (Doc. # 24 at 8–9). First, as already noted *supra*, Plaintiff is incorrect that presence of an agreement constitutes an "exception" to any rules regarding the FLSA. Furthermore, whereas he is correct that the reasonableness of an agreement is a factual determination, he offers absolutely no evidence that would suggest a conclusion that the agreement reached by the City and its police officers was unreasonable. He points to no testimony outlining a discrepancy between time credited by the agreement and actual time needed to complete certain tasks related to the care of a police canine. He points to no evidence of any intangible aspects of such care that benefit the City. *See, e.g., Brock*, 236 F.3d at 803 (describing time spent doing things such as feeding, playing, petting and "and all the ordinary activities owners engage in with their pets" that necessarily and primarily benefit the City). He points to no off-duty efforts he undertook that were "an integral and indispensable part of the principal activities" of his employment. *Id.* In the absence of any such evidence, there is no genuine issue of material fact that the agreement embodied in the CBA provision respecting compensatory time was unreasonable. Further, as noted *supra*, the presence of a reasonable agreement such as this between the parties reflects a consensus among the City of Dayton and its police officers regarding the other two inquiries under the FLSA, to wit: how much off-duty time is devoted to activities that could be deemed compensable work, and whether such falls under the rubric of the FLSA. Regardless, as already explained, Plaintiff offers no evidence as to these inquiries. As such, summary judgment is appropriate with respect to Plaintiff's FLSA claim.

## C. *Ohio Whistleblower Act*

■ Plaintiff alleges that he was discharged from his job in retaliation against his reporting of the harassment of Officer Monica Hunt, in violation of Ohio's Whistleblower Act. Ohio Rev.Code § 4113.52. That statute spells out particular procedures that an individual must follow in order to be afforded the protections therein. Under the statute,

> [i]f an employee becomes aware in the course of his employment of a violation by a fellow employee of any state or federal statute … and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

Ohio Rev.Code § 4113.52(A)(1)(a). The plain language of the statute reflects the requirement that the individual must reasonably believe the violation is EITHER (a) a criminal offense that is likely to cause either (i) an imminent risk of physical harm to persons or (ii) a hazard to public safety, OR (b) is a felony. The Sixth Circuit has agreed with this construction of the statute, specifically rejecting an interpretation that would read "a hazard to

public health or safety" as a third disjunctive element of a possible violation observed by an employee. *See Brooks v. Martin Marietta Utility Services, Inc.*, 166 F.3d 1213, 1998 WL 739890 at *4–5 (6th Cir.1998) (agreeing that the former interpretation is proper because it is grammatically correct, it makes the most logical sense and it comports with language used by the Ohio Supreme Court).

The basis of Plaintiff's claim is a letter he sent to Major Wanda Smith, the Superintendent of Operations and E.E.O.C. Officer, on August 10, 2001. Therein, he described alleged harassment of Hunt:

> During [the training period for the Interim S.W.A.T. Team] it was a common occurrence to see Officer Hunt's picture plastered on the range fence at the academy with slanderous comments. I personally observed Lt. Brown on more than one occasion make an offensive gesture with his thumb going across his throat. This gesture was made to members of the Interim Team and seemed to suggest that either he felt we had cut our own throat, or that he would end our S.W.A.T. career.

Smith Letter at 1.

Defendants contend that this does not meet the statute's mandatory requirements in that the statements contained within Plaintiff's report were vague and that they did not allege that which he reasonably believed to be a criminal offense likely to cause imminent physical harm or hazard to public health or safety or is a felony. They point to *Thatcher v. Goodwill Industries of Akron*, 117 Ohio App.3d 525, 690 N.E.2d 1320 (Ohio App. 9 Dist.1997), wherein the plaintiff alleged that he had been discharged by the defendant for notifying authorities and others of the defendant's discriminatory practices, in violation of § 4113.52. The court rejected the plaintiff's claim under § 4113.52 because the report "failed to 'provide suffi-cient detail to identify and describe' any violation of the sorts with which the Act is concerned." *Id.* at 533–34, 690 N.E.2d 1320, *quoting* Ohio Rev.Code § 4113.52(A)(1)(a). Said reports referred to the plaintiff's supervisor's mistreatment of other employees, including, for example, calling a worker a "bitch," screaming at other workers and using "coarse language." *Id.* at 534, 690 N.E.2d 1320. The court agreed that such conduct was "unsavory," but concluded that it did not rise to the level required by § 4113.52. *Id.*

■ The Court agrees that the allegations of discrimination against Hunt set forth in Plaintiff's letter to Smith are vague and that, even construed most favorably to Plaintiff, they do not comply with the requirements of the statute. As noted *supra*, § 4113.52 requires that the individual have observed what he reasonably believes is either a criminal offense likely to cause imminent physical harm or hazard to public health or safety, or is a felony. Plaintiff's letter describing the alleged discrimination against Hunt, however, falls short of this requirement. Instead, it alleges merely that Hunt was subjected to "slanderous statements." Since slander is not a criminal offense or a felony, it does fall into either category identified by § 4113.52. Nor does the letter's reference to Brown's throat-cutting gesture rise to the level contemplated by § 4113.52. First, there is no indication that the gesture was directed specifically at Hunt. Further, based on the description in the letter, Plaintiff himself appears to have perceived Brown's gesture to be figurative—i.e., rather than threatening violence, Brown meant to imply that the careers of Plaintiff and other members of the interim S.W.A.T. team were in peril. Finally, although the Complaint (Doc. # 1) cites 42 U.S.C. § 2000(e) (i.e., discrimination under Title VII) as the basis for Plaintiff's

§ 4113.52 claim, such is not apparent from Plaintiff's letter. Regardless, violation of Title VII is not a criminal offense or a felony. Accordingly, such an allegation, even were it deemed to have been present in the letter, could not serve as a basis for giving Plaintiff whistleblower protection under the statute. Plaintiff's memorandum opposing summary judgment does not add any clarity to the issue, as it merely refers to the letter written by Plaintiff to Smith, without identifying any of the supposed discriminatory practices witnessed by Plaintiff that allegedly form the basis of his § 4113.52 claim. Accordingly, summary judgment is proper with respect to Plaintiff's claim under the Ohio Whistleblower Act.

### D. Intentional Infliction of Emotional Distress

 Lastly, Plaintiff brings a claim for intentional infliction of emotional distress. The Ohio Supreme Court has adopted the Restatement's definition of this tort: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America,* 6 Ohio St.3d 369, 374, 453 N.E.2d 666, 671 (Ohio 1983), *quoting* Restatement of the Law 2d, Torts (1965) 71, Section 46(1). As such, Ohio courts have distilled four requisite elements from that definition. Accordingly, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove:

(1) That the defendant either intended to cause the plaintiff emotional distress or that he knew or should have known that his actions would cause the plaintiff emotional distress;

(2) That the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community';

(3) That the defendant's conduct was the proximate cause of plaintiff's psychic injury; and

(4) That the resultant emotional distress was serious, such that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances.'

*Neal v. Hamilton Cty.,* 87 Ohio App.3d 670, 679, 622 N.E.2d 1130, 1137 (Ohio App. 1 Dist.1993) (citations omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46 cmt. d (1965).

Defendants argue that Plaintiff has presented no evidence as to any of the above elements. Specifically, they point to the absence in the record of evidence of any extreme or outrageous conduct on the part of the City of Dayton or of any mental anguish or suffering endured by Plaintiff that "no reasonable person could be expected to endure" (Doc. # 22 at 5).

 Plaintiff's response, in its entirety, is an instruction for the Court to "refer to Exhibits 1 and 2[, which] are evidence that satisfies all four elements of the plaintiffs' [sic] claim for intentional infliction of emotional distress" (Doc. # 24 at 4). This assertion, devoid of any analysis of those exhibits and any tendency they may have to demonstrate a genuine fact issue as to Plaintiff's claim for intentional infliction of emotional distress, falls woefully short of Plaintiff's burden in responding to a motion for summary judgment. Although a District Court, in considering a motion for summary judgment, is required to "draw

all reasonable inferences in favor of [the non-moving] party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "[it] is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Such wading and searching, however, is precisely what Plaintiff's response asks the Court to do. Since the Court declines, as it must, to do Plaintiff's work for him, it sees no genuine issue of material fact as to the claim for intentional infliction of emotional distress. As such, summary judgment is proper with respect to that claim. If, however, within twenty (20) calendar days of the date of this entry, Plaintiff desires the Court to reconsider this issue, it may move for such, spelling out specific evidence in the record upon which a reasonable jury could find for him on this claim. At that time, Defendants would have the requisite opportunity to respond.

### E. *Punitive Damages*

Defendants also ask that the Court conclude that Plaintiff is not entitled to punitive damages, as a matter of law. Plaintiff concedes that the City of Dayton cannot be liable for punitive damages, but insists that they are still proper with respect to the individual Defendants.

■■■■ Defendants correctly note that a plaintiff is entitled to punitive damages only where it can show a presence of actual malice or evil motive on the part of the defendant(s), where such actions are "characterized by hatred, ill-will, or a spirit of revenge, *or* ... a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Moskovitz v. Mt. Sinai Medical Ctr.*, 69 Ohio St.3d 638, 652, 635

N.E.2d 331, 343 (Ohio 1994) (emphasis in original) (citations omitted). Further, although Defendants do not define the standard for punitive damages sought under a claim pursuant to § 1983, that standard is similar. Specifically, "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, [is] sufficient to trigger a jury's consideration of the appropriateness of punitive damages." *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Since the Court has already found that reasonable inferences can be made that Plaintiff's co-workers (sworn police officers of the City of Dayton) entered his home under the color of state law and removed personal possessions of his, the Court believes that there remains a genuine issue of material fact as to Plaintiff's entitlement to punitive damages. As such, summary judgment is overruled with respect to punitive damages, as to the individual Defendants.

For the reasons explained herein, Defendant's Motion for Summary Judgment (Doc. # 22) is sustained in part and overruled in part. Remaining in this case are Plaintiff's claim under 42 U.S.C. § 1983, for violation of his rights under the Fourth Amendment, and his claim for punitive damages. Further, as explained *supra*, Plaintiff may file a motion for reconsideration of the Court's granting of summary judgment on his claim for intentional infliction of emotional distress, if said motion is accompanied by detailed and specific analysis of the record and if it is filed within twenty (20) days of the date of this entry.

Counsel listed below will take note that a telephone conference will be held, between the Court and counsel, beginning at 8:30 AM, Wednesday, June 23, 2004, for the purpose of setting a trial date and

other dates leading to the resolution of this litigation.